Deanna M. NEVES, individually and as natural guardian of Manuel D. Neves, III, a minor, and Manuel D. Neves, II, individually and as natural guardian and duly appointed conservator of the Estate of Manuel D. Neves, III, a minor, protected person, Petitioners,

v.

Robert E. POTTER, D.O., and Gilbert Roth, D.O., Respondents.

No. 87SC373.

Supreme Court of Colorado,
En Banc.

Feb. 13, 1989.

As Modified on Denial of Rehearing
March 13, 1989.

Law Firm of Kenneth D. Kinnaird, Kenneth D. Kinnaird, Colorado Springs, for petitioners.

Cooper & Kelley, P.C., Mick T. Mihm, and John R. Mann, Denver, for respondent, Robert E. Potter, D.O.

Wills and Gorsuch Kirgis, Lee R. Wills, Colorado Springs, for respondent, Gilbert Roth, D.O.

Pryor, Carney and Johnson, Robert W. Carney, Irving G. Johnson, and Elizabeth C. Moran, Englewood, for amicus curiae, Colorado Defense Lawyers Ass'n.

Gerald P. McDermott and Springer and Steinberg, P.C., Jeffrey A. Springer, Denver, for amicus curiae Colorado Trial Lawyers Ass'n.

ERICKSON, Justice.

We granted certiorari to review the court of appeals decision in *Neves v. Potter*, 748 P.2d 1335 (Colo.App.1987), which affirmed the trial court's entry of summary judgment in favor of the respondent doctors. The issue is whether a release executed by the Neves which specifically released the Eisenhower Hospital "as well as any and all other persons, firms or corporations" from liability for malpractice also operated to release the respondent doctors, who were not specifically named in the release. Because there is a genuine issue as to whether the Neves intended to release the doctors from liability through the execution of this release, we reverse and return the case to the court of appeals with directions to remand to the trial court for further proceedings consistent with this opinion.

## I.

This action involves a medical malpractice suit brought against respondents, Drs. Robert E. Potter and Gilbert Roth, by Deanna M. and Manuel D. Neves, II, individually, as guardians of and as conservators for their son Manuel D. Neves, III (Manny). On April 21, 1974, Manny, then twenty-two months old, was admitted to the Eisenhower Hospital in Colorado Springs for treatment of an ear infection. The following day, surgery was performed with Drs. Potter and Roth serving as Manny's operating and attending physicians. After the surgery, the doctors used a post-nasal pack to control bleeding, which was left tied in place when Manny was taken to the recovery room. Routine post-operative orders were issued to the nurses, including directions that Manny be given appropriate doses of codeine if he exhibited signs of discomfort.

A few hours after being taken to the recovery room, Manny stopped breathing. The hospital staff, after removing the post-nasal pack, successfully resuscitated the child. During the course of the resuscitation it was discovered that Manny had mistakenly been administered an adult dose of morphine rather than the ordered amount of codeine for a child. Manny appeared to recover from the incident. Later however, he exhibited both a speech defect and a mild learning disability.

The Neves threatened to sue Eisenhower Hospital, alleging that Manny was brain damaged as a result of the respiratory arrest brought on by the morphine overdose. Counsel for the Neves entered into settlement negotiations with Eisenhower's insurance carrier, Glen Falls Insurance Company, and an agreement was reached. The agreement required in part that the Neves execute a release in favor of the hospital.

The Neves filed a Petition for Appointment of Conservator with the district court sitting as a probate court and attached a copy of the proposed release which had been executed on September 20, 1978. The district court judge issued an order on September 28, 1978, approving the petition and stated:

> That the proposed compromised settlement on behalf of said minor set forth in the Petition filed herein be and the same hereby is authorized, and said Conservator is directed to accept the sum of $17,000.00 for Manuel D. Neves, III in full and complete settlement of all claims of said minor and said Conservator *against Eisenhower Hospital, its successors and assigns,* for any and all claims growing out of said accident and to execute a release.

(Emphasis added.)

The order is materially different from the September 20 release because the class of persons described in the release is substantially broader than the class of persons

described in the order. Specifically, the September 20 release states that the Neves

release, acquit and forever discharge Eisenhower Hospital, and its successors, assigns, agents, servants, principals and insurers, *and any and all other persons, firms, or corporations* who are or might be liable of and from any claims ... resulting or to result from malpractice which occurred on or about August, 1974, at Colorado Springs, Colorado.

(Emphasis added.)

On October 2, 1980, the Neves filed a malpractice suit against the respondent doctors in the El Paso County District Court. The complaint alleged that before the morphine overdose was administered, the respondents negligently placed the post-nasal pack in such a way that it blocked Manny's airway and induced the respiratory arrest. The respondents moved for summary judgment, asserting that the September 20 release entered into between the Neves and Eisenhower effectively released them from liability for claims arising from that incident. The Neves moved to reform the release. The trial court denied the motion, and entered summary judgment in respondents' favor on April 8, 1985. The Neves appealed the trial court's action to the Colorado Court of Appeals.

The court of appeals issued two opinions regarding the case. Its first opinion, issued May 28, 1987, reversed the trial court's entry of summary judgment because the release did not expressly identify the respondents as parties who were released and whose liability was discharged. *Neves v. Potter*, No. 85CA1001 (Colo.App. May 28, 1987). The respondent doctors filed a motion for rehearing, which was granted. The court of appeals then withdrew its May 28 opinion and issued a new opinion affirming the trial court. The court of appeals stated:

While the release before us did not explicitly name the defendants as parties to the discharge from liability, we hold that the language "any and all other persons" in a release when coupled with the limiting language "resulting or to result from

malpractice which occurred" on a specific date is sufficiently specific to identify those to be discharged and to comply with the requirements of the [Uniform Contribution Among Tortfeasors Act]. Hence, the trial court correctly ruled that the Neves' release discharged the defendants.

*Neves v. Potter*, 748 P.2d 1335, 1337 (Colo. App.1987). We granted certiorari to address the question of whether the form release of "all other persons, firms or corporations" discharges all joint tortfeasors from liability under section 13–50.5–105.

## II.

The issue in this case, arising from the differences between the terms of the release agreement and the district court's order authorizing the agreement, focuses on the intended scope of the release. The conflict between the terms creates an ambiguity as to the intended scope of the release, and causes us to determine whether there was any genuine issue of material fact as to the intended scope. We reach the issue upon which certiorari was granted because if it is found that the release reflects the parties' intent, then it must be determined whether, as a matter of law, a form which provides for the release of "all other persons, firms or corporations" discharged the respondent doctors.

A release is the relinquishment of a vested right or claim to a person against whom the claim is enforceable. *E.g., Trustee Co. v. Bresnahan*, 119 Colo. 311, 203 P.2d 499 (1949). At common law, and for many years in Colorado, the release of one joint tortfeasor served to release all other joint tortfeasors. *E.g., Cox v. Pearl Inv. Co.*, 168 Colo. 67, 450 P.2d 60 (1969); *Price v. Baker*, 143 Colo. 264, 352 P.2d 90 (1959); *Morris v. Diers*, 134 Colo. 39, 298 P.2d 957 (1956). The traditional rationale given for this rule was that where two or more tortfeasors acted in concert to cause an injury, the act of one became the act of all and a single cause of action, with each participant being liable for the entire loss sustained by the plaintiff. Prosser, *Joint Torts and Several Liability*, 25 Calif.L.

Rev. 413, 418 (1937). The release of one joint tortfeasor was a surrender of the entire cause of action, and resulted in releasing each tortfeasor from liability. W. Keeton, W. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 49, at 332 (5th ed. 1984); *e.g., Cingoranelli v. St. Paul Fire & Marine Ins. Co.,* 658 P.2d 863, 866 (Colo.1983).

The common-law doctrine of release of joint tortfeasors has come under widespread criticism as yielding results that are "harsh," "without any rational basis," and "very unfair." J. Calamari & J. Perillo, *The Law of Contracts* § 20-3 (2d ed. 1977); *e.g., Alsup v. Firestone Tire & Rubber Co.,* 101 Ill.2d 196, 77 Ill.Dec. 738, 461 N.E.2d 361 (1984); *Bjork v. Chrysler Corp.,* 702 P.2d 146 (Wyo.1985). The basis for the criticism was well put by the Ohio Supreme Court when it stated in *Whitt v. Huchison,* 43 Ohio St.2d 53, 330 N.E.2d 678 (1975), that:

> The injustice of the traditional rule was that it frequently acted to extinguish a cause of action which was only partly compensated, even though the parties themselves had no such intention. The rule also made it very difficult for a claimant to settle a claim by partial settlements with several persons who were jointly liable for his injury. A major cause of these difficulties was the doctrine of joint liability itself, a doctrine largely grounded in a policy of assuring compensation for injured plaintiffs, but which the traditional rule paradoxically converted into a burden and a trap for unwary plaintiffs.

*Id.* at 57, 330 N.E.2d at 681 (citation omitted).

Many states have abandoned the common-law release rule by enacting a version of the Uniform Contribution Among Tortfeasors Act (UCATA), which was drafted with the specific purpose of avoiding the inequities that resulted from adherence to the traditional rule. *See* Uniform Contribution Among Tortfeasors Act, 12 U.L.A. 57, 59-62 (1975). In place of the traditional rule, the UCATA adopted the rule advanced by Professors Prosser and Keeton, who have advocated that "[t]he only desirable rule would seem to be that a plaintiff should never be deprived of a cause of action against a wrongdoer when the plaintiff has neither intentionally surrendered the cause of action nor received substantially full compensation." W. Keeton, W. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 49, at 335 (5th ed. 1984).

Effective July 1, 1977, the General Assembly abrogated the common law release rule in Colorado by passage of the UCATA, sections 13-50.5-101 to -106, 6A C.R.S. (1987 & 1988 Supp.). Section 13-50.5-105 of the UCATA provides that:

> (1) When a release ... is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
> (a) It does not discharge any of the other tortfeasors from liability for their several pro rata shares of liability for the injury, death, damage, or loss *unless its terms so provide....*

(Emphasis added.)

The underscored phrase, "unless its terms so provide," lies at the heart of this dispute. Specifically, we must determine whether the Neves, by executing a document releasing Eisenhower Hospital and "any and all other persons, firms or corporations who are or might be liable" for any damages, "provide[d]" pursuant to section 13-50.5-105, that the respondent doctors were released from liability. While this is a case of first impression in Colorado, several other jurisdictions have addressed the identical issue, with mixed results.

A review of cases from other jurisdictions reveals that there are three different views as to whether the release of a particular tortfeasor along with a boilerplate release of "all other persons, firms or corporations" discharges all tortfeasors. There appears to be neither a clear majority of jurisdictions that favor one view over the others nor a detectable trend among the most recent cases.

Some jurisdictions hold that a release similar to the one involved in the present dispute absolutely bars a plaintiff from

proceeding against unnamed tortfeasors. *See, e.g., Douglas v. United States Tobacco Co.*, 670 F.2d 791 (8th Cir.1982); *Morison v. General Motors Corp.*, 428 F.2d 952 (5th Cir.1970), *cert. denied*, 400 U.S. 904, 91 S.Ct. 142, 27 L.Ed.2d 141 (1970); *Doganieri v. United States*, 520 F.Supp. 1093 (N.D.W.Va.1981); *Battle v. Clanton*, 27 N.C.App. 616, 220 S.E.2d 97 (1975); *Hasselrode v. Gnagey*, 404 Pa. 549, 172 A.2d 764 (1961). Other jurisdictions have reached the opposite conclusion, choosing to give the statutory language "unless its terms so provides" a narrow construction. Under this view, the release of one tortfeasor does not discharge other joint tortfeasors unless the latter are either named in the release or specifically identifiable from the face of the release. *See, e.g., Alsup v. Firestone Tire & Rubber Co.*, 101 Ill.2d 196, 199–200, 77 Ill.Dec. 738, 740–41, 461 N.E.2d 361, 363–64 (1984); *Sage v. Hale*, 75 Misc.2d 256, 257, 347 N.Y.S.2d 416, 418 (N.Y.Sup.Ct.1973); *Beck v. Cianchetti*, 1 Ohio St.3d 231, 234, 439 N.E.2d 417, 420 (1982); *Bjork v. Chrysler Corp.*, 702 P.2d 146, 163 (Wyo.1986);

A third line of cases takes a middle road and holds that while the release of all "persons, firms or corporations" does not in and of itself discharge unnamed joint tortfeasors, it will serve that purpose if and to the extent that the parties who negotiated the release intended it to do so. *See, e.g., McInnis v. Harley–Davidson Motor Co.*, 625 F.Supp. 943, 957 (D.R.I.1986); *Sellon v. General Motors Corp.*, 521 F.Supp. 978, 983–84 (D.Del.1981); *Manos v. Trans World Airlines, Inc.*, 295 F.Supp. 1166, 1169–70 (N.D.Ill.1968) (applying California law); *Chakov v. Outboard Marine Corp.*, 429 A.2d 984 (Del.1981); *Hurt v. Leatherby Ins. Co.*, 380 So.2d 432, 433–34 (Fla. 1980); *cf. Harris v. Grizzle*, 599 P.2d 580, 585–86 (Wyo.1979) (involving a release of "any claims" as opposed to a release of "all persons, firms or corporations"). As noted by the court in *McInnis*, the view requiring that the parties' intent be ascertained is a synthesis of the two other views. Whereas the "absolute bar" rule presumes that the parties intended to release all joint tortfeasors, and the "expressly designated" rule presumes that the parties intended to release only those persons or entities who are named in or discernible from the release, the "intent" rule abandons both of the fictitious presumptions and permits the actual intent of the parties to control. *McInnis*, 625 F.Supp. at 949.

### A.

The easiest of the three rules to administer is that which the respondent doctors urge us to adopt, the "absolute bar" rule. This rule, under which a general release of "all persons, firms or corporations" discharges all tortfeasors, has been criticized as prolonging the pre-UCATA legacy of releasing all joint tortfeasors although the releaser may not have intended to release unnamed tortfeasors or may not have received full compensation. Many courts have been justifiably critical of the "absolute bar" rule. A strong case against adopting this rule is found in *McInnis v. Harley–Davidson Motor Co.*, 625 F.Supp. 943 (D.R.I.1986). Rejecting both the "absolute bar" and "express designation" rules in favor of the "intent" rule, the court stated that rejection of the "absolute bar" rule is appealing

> as a matter of simple justice and is consonant with the approach consistently taken by the Supreme Court over the last two decades. The tenor of [the state's] jurisprudence is to withhold from a wrongdoer a trouvaille for which it has not bargained and to be slow to strip away a victim's right to recover for actionable negligence. To preclude redress on the basis of a legal fiction arising from the chance insertion of boilerplate wording in a printed form of release procured by one other than the defendant is at odds both with fundamental fairness and with the threads which bind together [the state's] judge-made tort law.

*Id.* at 954–55.

The Supreme Court of Illinois expressed a similar concern over the adoption of the "absolute bar" rule. In *Alsup v. Firestone Tire & Rubber Co.*, 101 Ill.2d 196, 77 Ill. Dec. 738, 461 N.E.2d 361 (1984), the court noted that "[a] purpose of [adopting the

UCATA] was to abrogate the common-law rule.... If liberal effect were given to every use of a general release form and 'all other persons, firms and corporations' ... were to be discharged, an important purpose of the [UCATA] would be thwarted by the unintended release of persons who were strangers to the release contract." *Id.* at 199–200, 77 Ill.Dec. at 740–41, 461 N.E.2d at 363–64. The court went on to say that

> the legislature intended to abolish the common law rule that produced an involuntary discharge of joint tortfeasors. Section 2(c) states that a release will not operate to 'discharge any of the other tortfeasors from liability for the injury....' We do not consider that the modifying language that follows, i.e., 'unless its terms so provide,' should be interpreted to allow the legislative intendment of nullifying the common law rule to be frustrated through the use of what are often general release forms.

*Id.* at 200, 77 Ill.Dec. at 741, 461 N.E.2d at 364.

In our view, the concerns expressed in *McInnis* and *Alsup* are well-founded. The "absolute bar" rule violates the spirit of the UCATA and frustrates section 13–50.5–105's express goal of retaining the liability of joint tortfeasors. It provides joint tortfeasors, who are neither signatories of nor contributors to a release, a windfall benefit for which they did not bargain. Adoption of the rule would contravene not only the UCATA, but would also curb the modern trend of the Colorado judiciary in stripping away artificial and anachronistic barriers to tort recovery by injured parties. *See, e.g., Myer v. State Farm Mut. Ins. Co.,* 689 P.2d 585 (Colo.1984) (common-law doctrine of intra-family immunity abrogated in tort actions arising from motor vehicle collisions in order to allow "a specific class of innocent persons, those persons related to and living with the negligent driver," to recover when injured by driver's negligence); *Owens v. Brochner,* 172 Colo. 525, 474 P.2d 603 (1970) (rejecting as patently unjust the traditional rule that two year statute of limitations for medical malpractice action accrued at the date of the negligent act in favor of the rule that statute of limitations runs from the date the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the negligence); *Trevarton v. Trevarton,* 151 Colo. 418, 378 P.2d 640 (1963) (parent-child immunity does not bar son from suing his father for personal injuries caused by father's negligence where the injuries were inflicted in the performance of duties related to work as distinguished from parental duties); *Rains v. Rains,* 97 Colo. 19, 46 P.2d 740 (1935) (abrogating the common law by holding that a wife could sue her husband for personal injuries caused by his negligence); *Bradford v. Bendix–Westinghouse Auto. Air Brake Co.,* 33 Colo. App. 99, 517 P.2d 406 (1973) (permitting injured party who was in the zone of danger created by a defective product but who was neither the ultimate consumer nor user to sue under strict liability theory and abolishing privity of contract requirement under which recovery was available only to "ultimate user or consumer").

Our overriding concern has been and will continue to be that a victim of tortious conduct has a fair and realistic opportunity to recover appropriate damages. The "absolute bar" rule is at odds with this concern. Since 1977, the common-law rule regarding the release of joint tortfeasors has been abolished in Colorado; we will not resurrect it now by holding that a general release, in and of itself, discharges all joint tortfeasors. Accordingly, we do not apply the "absolute bar" rule in this case.

### B.

We also chose not to apply the "express designation" rule in this case because it swings the pendulum too far in the other direction. The General Assembly has expressly provided that a release of one tortfeasor does not release other tortfeasors "unless its terms so provide." § 13–50.5–105(1)(a). There is nothing in the statute which suggests that a releaser must be punctilious to the point of mathematical precision in identifying every person whom he intends to discharge. The legislature could have easily chosen to re-

strict the application of a release to those specifically named therein. It chose not to. The meaning of the statute should be determined from the statute's plain language, *Charnes v. Lobato,* 743 P.2d 27 (Colo.1987), and we will not usurp the legislature's power by deciding what should have been said.

There are also several policy considerations which argue against the "express designation" rule. Under the UCATA "[a] tortfeasor who enters into a settlement with a claimant is not entitled to recover contributions from another tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement...." § 13–50.5–102(4). Under the statute, a settling defendant who may have planned to seek contribution from other tortfeasors would be unable to do so if express designation was required because the liability of the non-settling tortfeasors would not have been extinguished by the release. Thus, the tortfeasor who settled for more than his pro rata share of liability in order to avoid the potential of a larger judgment would be barred from recovering the excess of this pro rata share from other joint tortfeasors who were not expressly designated. This result is not only inequitable, but it also frustrates the express purpose of the UCATA, which is to "encourage rather than discourage settlements." Uniform Contribution Among Tortfeasors Act, 12 U.L.A. 57, 65 (1975).

It is worth noting that the Colorado General Assembly elected to enact the Uniform Contribution Among Tortfeasors Act rather than the Uniform Joint Obligation Act (UJOA). Both Acts abrogate the common-law release rule, and are virtually identical in all respects but one: The UCATA does not discharge joint tortfeasors "unless [the release] terms so provide," while the UJOA does not release joint tortfeasors "unless [the release] terms *expressly* so provide." (Emphasis added.) Those states which have enacted a form of the UJOA typically require that a release expressly designate by name or otherwise specially describe those tortfeasors who are to be discharged

by the release.[1] *See, e.g., Hansen v. Collett,* 79 Nev. 159, 172, 380 P.2d 301, 308 (1963); *Sage v. Hale,* 75 Misc.2d 256, 257–58, 347 N.Y.S.2d 416, 418–19 (N.Y.Sup.Ct. 1973). Had the General Assembly intended to require that express designation was a prerequisite to releasing a joint tortfeasor, it could have adopted a version of the UJOA rather than the UCATA.

### C.

■ In our view, the "intent" rule most nearly comports with existing Colorado case law and most effectively promotes the purpose and spirit of the UCATA. Under this rule, the scope of a general release is dependent upon the intent of the parties who negotiated the release. Tortfeasors who are not parties to the release are called on to show either that the release was intended to discharge them or that the releaser has received full compensation for the injuries sustained. *Fieser v. St. Francis Hosp. & School of Nursing, Inc.,* 212 Kan. 35, 510 P.2d 145 (1973); *Missouri v. Crandall,* 581 S.W.2d 829 (Mo.1979); *Harris v. Grizzle,* 599 P.2d 580 (Wyo.1979).

It is a general rule of law that it is a court's duty to construe an instrument so as to effectuate the manifest intention of the parties. *E.g., Harrison Western Corp. v. Gulf Oil Co.,* 662 F.2d 690 (10th Cir. 1981); *Martinez v. Continental Enter.,* 730 P.2d 308 (Colo.1986). The intention of the parties as determined by the court shall rest on good sense and plain understanding of the words used and acts directed to be performed. *E.g., Charles Ilfeld Co. v. Taylor,* 156 Colo. 204, 397 P.2d 748 (1964). In spite of the general rules, the respondent doctors argue that since the release involved in this dispute is unambiguous and clear, resort may not be had to any extrinsic source, even if that source sheds light on the parties' intent. *See, e.g., Radiology Prof. Corp. v. Trinidad Area Health Ass'n, Inc.,* 195 Colo. 253, 577 P.2d 748 (1978).

---

**1.** Six states have adopted a version of the Uniform Joint Obligations Act: Hawaii, Maine, Nevada, New York, Utah, and Wisconsin.

▮ While it is generally correct that an unambiguous document must be interpreted based only upon the information contained within its four corners, such is not always the case. Parol evidence can be used to vary or contradict the document when the litigation is between a party to the contract and a stranger thereto. *Bardwell v. C.I.R.*, 318 F.2d 786 (10th Cir.1963); *American Crystal Sugar Co. v. Nicholas*, 124 F.2d 477 (10th Cir.1941) (applying Utah law); *Continental Trust Co. v. Johnston*, 67 Colo. 592, 188 P. 1112 (1920); *Green v. Grant*, 635 P.2d 236 (Colo.App.1981); *see generally* 9 J. Wigmore, *Evidence* § 2446 (3d ed. 1940 & 1980 Supp.). This exception to the parol evidence rule accurately reflects Colorado's unsympathetic position toward parties who seek to take gratuitous advantage of an agreement when they are not parties to the agreement. Such an interdiction is exactly what the respondent doctors, strangers to the Neves–Eisenhower release, attempt to accomplish. In view of case law, their attempt to bar admission of extraneous evidence which might show that the Neves intended to release only Eisenhower must fail.

We next turn to the reason why the "intent" rule should be adopted to govern our analysis of this case. While this court has not addressed the "intent" rule with regard to which *parties* a document releasing "all persons, firms or corporations" discharges, it has done so regarding which *claims* such a release discharges. In *Cingoranelli v. St. Paul Fire & Marine Ins. Co.*, 658 P.2d 863 (Colo.1983), we held that the scope of claims to be discharged by a release was to be ascertained based upon the parties' intent. *Id.* at 865. The general release involved in *Cingoranelli* was executed prior to Colorado's enactment of the UCATA and was decided under the common-law release rule as it existed in Colorado. Nevertheless, the reasoning of *Cingoranelli* is instructive on the issue of intent.

The *Cingoranelli* court stated that an injured automobile passenger's general release of the driver, in the absence of a specific provision which unequivocally includes personal injury protection (PIP) claims within the terms of the release, did not discharge the driver's automobile insurance carrier from its obligation to pay PIP benefits to the injured passenger absent a contrary intent. *Id.* at 869. The court distinguished Cingoranelli's tort claim from her PIP claim, stating that the two were separate and distinct. Since two distinct claims existed and since under the Colorado Auto Accident Reparations Act, sections 10–4–701 to –723, 4 C.R.S. (1973 & 1982 Supp.), when a tort action could be maintained, tort recovery excluded losses required to be paid under PIP coverage, the court reasoned that

> it is simply unreasonable to assume that an automobile accident victim executing a general tort release intends thereby to release PIP claims that are unrelated to the fault principles of tort liability. Rather, the presumed intention in such a case would be to preserve PIP claims, since the losses underlying their claims are not compensable in a tort action and, therefore, would not constitute part of any judgment that might be subsequently satisfied in that action.

*Id.* at 869.

The emphasis in *Cingoranelli* on the intent and presumed intent of the releasing party strongly suggests that a similar emphasis is appropriate in the present case. Colorado courts have traditionally viewed intent as the key element in other situations as well. *See, e.g., Allard Cattle Co. v. Colorado & S. Ry. Co.*, 187 Colo. 1, 530 P.2d 503 (1974) (intent is the very essence of an abandonment claim); *In re Dewson's Estate*, 181 Colo. 189, 509 P.2d 311 (1973) (cardinal rule in construing wills is to ascertain the intent of the testator); *Falbo v. U.S. Nat'l Bank*, 116 Colo. 508, 181 P.2d 1020 (1947) (an essential requirement of an *inter vivos* gift is intent); *Koscove v. Koscove*, 113 Colo. 317, 156 P.2d 696 (1945) (intention to make a home in fact and absence of any intention to live elsewhere are essential to the acquisition of a domicile); *Razatos v. Daniels & Fischer Store Co.*, 110 Colo. 105, 131 P.2d 417 (1942) (whether chattel property brought to land becomes a fixture is dependent upon the party's in-

tent); *Taylor v. Briggs,* 99 Colo. 89, 60 P.2d 1081 (1936) (whether conveyance was absolute or for security purposes only depends upon party's intent); *Farmers Reservoir & Irr. Co. v. Sun Productions Co.,* 721 P.2d 1198 (Colo.App.1986) (construction of deed is matter of law with paramount purpose of ascertaining intent of parties).

Similarly, the United States Supreme Court has viewed intent as the polestar to determining the scope of a release. In a variety of arenas, the Supreme Court has signaled its disdain, as a matter of policy as well as federal law, for rules which give broad preclusive effect to release agreements. Thus, in the antitrust area, the Court has adopted "[t]he straightforward rule ... that a party releases only those other parties whom he intends to release." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 347, 91 S.Ct. 795, 810, 28 L.Ed.2d 77 (1971). So, too, has the Court looked to intent in the intellectual property setting. *See Aro Mfg. Co. v. Convertible Top Co.,* 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) (adopting intent rule for patent infringement cases). The *Zenith* Court rejected the older rules which automatically released the joint tortfeasors, *see Zenith,* 401 U.S. at 343, 91 S.Ct. at 808, or required an express reservation of rights against them, *see id.* at 344, 91 S.Ct. at 809, because these rules "would frustrate ... partial settlements, and thereby promote litigation ... [and] would create a trap for unwary plaintiffs' attorneys." *Id.* at 347, 91 S.Ct. at 810.

■ We believe that this emphasis on ascertaining the party's intent is well-placed and should be extended to the construction of general releases. Such a construction effectuates the purpose of the UCATA in that it retains the liability of joint tortfeasors unless the releaser intended to discharge all potential claims. Moreover, it ensures that an injured plaintiff will not be barred from recovery because he executed a release in which he unknowingly and unintentionally discharged joint tortfeasors. Finally, it continues on-going efforts to eradicate out-dated, inequitable rules that prevent injured parties from re-

covering compensation. For these reasons, we apply the "intent" rule and hold that the release in this case does not discharge those who are not parties to the release unless the releasers so intended.

## IV.

Summary judgment is a drastic remedy and is appropriate only upon a clear showing that no genuine issue of material facts exists and that the moving party is entitled to a judgment as a matter of law. *Churchey v. Adolph Coors Co.,* 759 P.2d 1336, 1339–40 (Colo.1988); *Ginter v. Palmer & Co.,* 196 Colo. 203, 205, 585 P.2d 583, 584 (1978). The moving party has the burden of establishing the lack of a triable factual issue, and all doubts as to the existence of such an issue must be resolved against the moving party. *Churchey,* 759 P.2d at 1339–40; *Travelers Ins. Co. v. Savio,* 706 P.2d 1258, 1276 (Colo.1985). These are the standards to be applied by an appellate court when reviewing a trial court's summary judgment order. *See generally* 6 J. Moore & J. Wicker, *Moore's Federal Practice,* ¶ 56.27[1] (2d ed. 1987 & 1987–88 Supp.); 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2716 (2d ed. 1983).

■ In this case we are presented with the task of ascertaining who the Neves intended to release based upon two documents which, when read together, conflict. For this we must look to the intent of the parties as expressed in the release instrument, considered in light of the nature of the claim and the objective circumstances underlying the release's execution. *See Cingoranelli,* 658 P.2d at 865. As noted earlier, the release executed by the Neves in favor of Eisenhower released the hospital and "any and all other persons, firms, or corporations who are or might be liable of and from any claims [arising from injuries suffered by Manny while at the Eisenhower Hospital]." The district court's order, to which the release was attached, was significantly more restrictive in that it released only "Eisenhower Hospital, its successors and assigns, for any and all claims growing out of said accident."

The Neves assert that it was their intent to release only the hospital from liability. Manuel Neves stated in an affidavit that "[i]n my discussions with my attorney, Lynn Southam, and with agents of Eisenhower Hospital Osteopathic, there was never any discussion about releasing any parties other than Eisenhower Hospital and its insurance company." An affidavit by Southam stated:

> The negotiator for the hospital ... and myself, I feel, share the same opinion that throughout all of our negotiations, we were concerned only about the hospital. There was never a representation on either of our parts that this settlement in any way would release Dr. Potter or any other person from liability. That was not part of the consideration at all.

The underlying circumstances of the release's execution, as evidenced by Manuel Neves's and Southam's testimony, indicate that there is a genuine issue as to whether the Neves intended to release the respondents from liability. When the release, the probate court's order, Manuel's and Southam's testimony, and the respondents' arguments are considered as a whole, it is clear that there remains a factual issue as to whom the Neves intended to release.[2] Since summary judgment is to be entered only where no genuine issue of a material fact exists, it was error to grant summary judgment in this case.

Because genuine issues of material fact remain as to whether the Neves intended to release the respondent doctors from liability, summary judgment should not have been granted in respondents' favor. Accordingly, we reverse and return this case to the court of appeals with directions to remand to the trial court for further proceedings consistent with this opinion.

LOHR, J., specially concurs and ROVIRA, J., joins in the special concurrence.

JUSTICE LOHR specially concurring:

I concur with section II of the court's opinion which holds that the general release in this case did not discharge those who were not parties to the release unless the releasers so intended. I also concur with the court's conclusion that summary judgment should not have been granted in favor of Doctors Potter and Roth since

---

2. We note that after the hearing on petitioners' motion to reform the release was held, the trial court stated:

> The Court's file in the guardianship settlement together with the care taken during the settlement hearing are replete with evidence that the parties and the Court intended full and final compensation for the child's entire condition and· there is absolutely no mention, inuendo [sic] or inference whatsoever that such was a partial settlement.

The respondents contends that this finding disposes of the intent issue. We disagree.

The trial court's statement occurred while it was considering whether to grant a motion for reformation, not a motion for summary judgment. The trial court stated that under either a "clear and convincing" or "preponderance of the evidence" standard, the petitioner failed to meet his burden which would allow reformation of the release. We point out that in a motion for summary judgment neither the "clear and convincing" nor "preponderance of the evidence" standard is applicable. Rather, the appropriate standard is whether there is a genuine issue of material fact. *Churchey v. Adolph Coors Co.,* 759 P.2d 1336, 1339–40 (Colo.1988). Thus on remand the trial court must determine whether the existence of a genuine issue of material fact forecloses summary judgment. Whether the facts meet the "clear and convincing" or "preponderance" of the evidence standard is irrelevant to the resolution of the motion for summary judgment.

Moreover, in its modified order denying petitioners' motion for reformation, the trial court listed the documents it relied upon in reaching its conclusion. The list is composed of the following documents: (1) Exhibit I, being the Transcript of the hearing held at the time of the guardianship settlement; (2) Petition for Settlement; (3) Order Approving Settlement; (4) Release; (5) Larry Wellman's Neuropsychological Evaluation Report; and (6) Affidavit of Dr. Lovejoy. The affidavits sworn out by Manuel Neves and counsel which state that they intended to release only Eisenhower Hospital from liability were not considered by the trial court. In determining whether to grant a motion to reform, the court must ascertain whether there was a mutual mistake by the parties. *See Crews v. Yenter,* 143 Colo. 102, 352 P.2d 295 (1960); *Smith v. Whitlow,* 129 Colo. 239, 268 P.2d 1031 (1954). The petitioners' affidavits are, in our view, probative of the issue of mutual mistake. As such, the trial court should have considered the affidavits when ruling on the petitioners' motion to reform. Likewise, the affidavits should also be considered in reviewing the respondents' motion for summary judgment.

genuine issues of material fact remain. However, this case presents two separate issues of material fact regarding the scope of the release. First is the issue addressed by the majority: whether, under the "intent" rule held applicable today, the parties to the release intended to release the respondent doctors. Second, and not addressed by the majority, is the issue of material fact created by the difference between the terms of the release agreement and the district court's order authorizing the agreement. On remand, the issue of the intent of the parties to the release need not be reached if the finder of fact determines that the district court's order authorizing the agreement limited the scope of the release so as not to release the doctors. Therefore, I write separately to discuss the importance of this additional issue of material fact.

Manuel D. Neves II, in his individual capacity and as conservator of his son's estate,[1] and Deanna M. Neves executed an agreement that purported to release and discharge not only the hospital and its agents, but also "any and all other persons, firms or corporations" that might be liable for malpractice related to their son's surgery. After executing the agreement, Manuel D. Neves II filed a petition with the district court seeking appointment as conservator of his son's estate and requesting court approval of the settlement agreement and release. *See* § 15–14–401, 6B C.R.S. (1987) (detailing court's power to appoint a conservator to oversee a minor's estate and affairs). The district court held a hearing on the petition. At the conclusion of the hearing, the court appointed Manuel D. Neves II as his son's conservator, and it issued an order authorizing the settlement agreement and directing the conservator to accept $17,000 on behalf of his minor son in full and complete settlement of all claims of said minor and said conservator against Eisenhower Hospital, its successors and assigns, for any and all claims growing out of said accident and to execute a release.

The terms of the court order authorizing the release and directing payment are narrower than the terms of the release document executed by the Neves. Whereas the release agreement purported to release "any and all persons" liable for the malpractice, the district court's order provided only for the settlement of all claims against the hospital. The difference between the language of the release agreement and the terms of the district court's order [2] creates an issue of material fact as to the authorized scope of the release. If the effect of the district court order was to authorize a release only of the hospital and not the doctors,[3] then the issue of whether the parties to the release intended that the doctors be released need not be reached. This factual issue of the authorized scope of the release cannot be resolved without a full evidentiary presentation regarding the circumstances surrounding the negotiation and execution of the release and the issuance of the district court's order.

Because I view the differences between the terms of the release agreement and the district court's order as creating a genuine issue of material fact regarding the authorized scope of the release, I would instruct the district court on remand to resolve this issue first to determine if it is necessary to reach the intent issue discussed by the majority. Since I agree that genuine issues of material fact remain, I concur in

1. Neves executed the release as conservator of his son's estate on September 20, 1978. He was not appointed conservator until September 28, 1978.

2. The record indicates that the district court order was prepared by the Neves's counsel.

3. Additionally, it is not entirely clear that the malpractice described in the release and the court order includes any malpractice by the doctors in the use of the post-nasal pack. The release purports to cover "malpractice which occurred on or about August, 1974, at Colorado Springs, Colorado." In describing the malpractice to the court in the hearing on the approval of the release, counsel for Manuel D. Neves II said only that "the hospital nurse involved just did some wrong things," presumably a reference to the morphine overdose. No mention was made of the post-nasal pack. The court order approving the release simply refers to the "accident," and relies for further definition on the petition, which incorporates the release.

the conclusion reached by the court that summary judgment was inappropriate.

JUSTICE ROVIRA joins in this special concurrence.